## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

WANDA CORBIN, individually and on behalf
of all others similarly situated,

           Plaintiff,

    v.

AMEDISYS, INC., WILLIAM F. BORNE,
CINDY L. PHILLIPS, JEFFREY JETER, THE
PLAN ADMINISTRATIVE COMMITTEE,
and JOHN DOES 1-10,

           Defendants.

Civil Action No.: _____

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF ERISA**

Plaintiff Wanda Corbin, individually and on behalf of the Amedisys, Inc. 401k Plan (the "Plan") as well as all other similarly situated participants and beneficiaries in the Plan, alleges the following upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters based upon the investigation conducted by Plaintiff's counsel, which included reviewing the public documents of Amedisys, Inc. ("Amedisys" or the "Company"), the Company's filings with the United States Securities and Exchange Commission ("SEC") and the United States Department of Labor ("DOL"), public announcements made by Defendants, press releases published by and regarding Amedisys, Plan-related documents including trust agreements and Summary Plan Descriptions distributed by Defendants for the Plan, and other publicly available information.

## INTRODUCTION

1.    Plaintiff brings this action pursuant to §§ 502(a)(2) and (a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(2) and (a)(3), on behalf of the Plan and all Plan participants who invested their retirement assets in Amedisys

common stock through the Plan between January 1, 2006 and the present (the "Class Period") while the Company was engaged in improper Medicare reimbursement practices.

2.      Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties under ERISA by causing the Plan to offer, acquire and hold Amedisys common stock during the Class Period when it was an unduly risky and imprudent retirement investment because of the Company's improper business practices. As the truth regarding Defendants' misconduct has come to light, Amedisys's stock price has dropped precipitously, taking with it the retirement savings of Plaintiff and the other Plan participants.

3.      Defendant Amedisys is a provider of home health services and depends heavily on Medicare payments. Nearly 90% of the Company's revenue comes from providing services that are paid by Medicare. The Company's fees are set by the Centers for Medicare and Medicaid Services ("CMS") through its home health prospective payment program ("PPS"). Under PPS, Medicare paid certain additional amounts when patient care reached established benchmarks. For instance, between 2000 and 2007, the CMS paid home health agencies ("HHAs") -- such as Amedisys -- a flat fee of $2,200 for up to nine home therapy visits and an additional reimbursement of $2,200 upon the HHA's tenth therapy visit. Beginning in January 2008, CMS changed its PPS policy to eliminate the $2,200 tenth-visit payment, and instead provides additional payments of $2,200 upon the HHA's sixth, fourteenth and twentieth therapy visit.

4.      Since at least 2006, Amedisys encouraged its health provider employees to maximize the number of their home therapy visits when the visits were not medically necessary. Amedisys promoted these extra visits for the sole purpose of triggering extra Medicare payments to inflate Amedisys's home health Medicare revenue.

2

5.     Throughout the Class Period, Amedisys stock was an imprudent investment for the Plan because the Company was inflating its financial results through these improper Medicare reimbursement practices which jeopardized its future business with Medicare - its primary source of revenue - and increased the risk of investing retirement assets in Amedisys stock.

6.     Instead of disclosing to the Plan and its participants the risk of investing retirement assets in Amedisys stock through the Plan, the Company and Defendants misrepresented the Company's improper Medicare reimbursement practices and the effect of these practices on the Company's business operations and financial prospects. In particular, the Company's reported sales and earnings growth were materially inflated because the Company increased the number of in-home therapy visits to patients to trigger higher reimbursement rates under the Medicare home health prospective payment system when those excess visits were not medically necessary. These improper practices artificially inflated the Company's reported sales and earnings be cause these illicit reimbursements were subject to reclamation by Medicare. Moreover, these practices could subject the Company to civil monetary penalties and exclusion from participating in federal health care programs, which would materially impact the Company's ongoing business prospects.

7.     Defendants negligently continued to offer Amedisys stock when they should have known that it was imprudent to do so, violating their ERISA fiduciary duties.

8.     On April 27, 2010, *The Wall Street Journal* ("WSJ") first began to disclose information about the Company's improper practices in an article reporting that Amedisys was taking advantage of the Medicare reimbursement system.

9.     On May 12, 2010, the U.S. Senate Finance Committee ("Finance Committee") began investigating the Company's Medicare reimbursement practices.

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 3 of 37

10.     On June 30, 2010, the Company announced that the SEC had also launched a formal investigation into the same improper practices that the Finance Committee was examining.

11.     As the misconduct at Amedisys has come to light, the Company's stock price has plummeted.

12.     Amedisys's stock was trading as high as $66 per share during the Class Period. Since disclosure of the inflationary Medicare reimbursement practices and the resulting investigations, Amedisys's stock price has fallen and continues to fall, trading at approximately $27 per share as of the date of this Complaint.

13.     This action seeks relief for the Plan and its participants against the fiduciaries who are personally liable pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109, and 1132(a)(2) for continuing to offer Amedisys stock as a retirement investment in the Plan when it was imprudent to do so, and for failing to disclose the true risk of investing retirement assets in Amedisys stock.

14.     In addition, Plaintiff seeks other relief from Defendants under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), including injunctive relief, constructive trust, restitution, and other monetary relief.

15.     Plaintiff brings these claims on behalf of the Plan and, alternatively, as a class action on behalf of all participants and beneficiaries of the Plan during the Class Period.

## JURISDICTION AND VENUE

16.     **Subject Matter Jurisdiction.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

17.     **Personal Jurisdiction.** ERISA provides for nation-wide service of process. ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2). As all Defendants are either residents of the United States or subject to service in the United States, this Court has personal jurisdiction over them.

18.     **Venue.** Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, the Defendants reside or maintain their primary place of business in this District, or some or all of the fiduciary breaches for which relief is sought occurred in this District.

## PARTIES

**A.     Plaintiff**

19.     **Plaintiff Wanda Corbin** is a resident of Coo keville, Tennessee and was an employee of Amedisys during the Class Period.

20.     During the Class Period, Plaintiff was a participant in the Plan within the meaning of ERISA §§ 3(7) and 502(a), 29 U.S.C. §§ 1002(7) and 1132(a).

21.     During the Class Period, Plaintiff's account in the Plan invested in Amedisys stock.

**B.     Defendants**

22.     **Defendant Amedisys** is a provider of home health services to the chronic, comorbid and aging American population. The Company operates in two segments: home health and hospice segments. The Company's home health agencies deliver a range of services in the homes of individuals who may be recovering from surgery, have a chronic disease or disability or terminal illness and need assistance with the essential activities of daily living. Amedisys's typical home health patient is Medicare eligible, approximately 83 years old, takes approximately

5

12 different medications on a daily basis and has co-morbidities. Its hospice agencies provide palliative care and comfort to terminally ill patients and their families.

23. The Company is a Delaware corporation with its principal executive offices located at 5959 South Sherwood Forest Boulevard, Baton Rouge, Louisiana. Amedisys currently has agencies in more than 600 locations across the United States. The Company serves 45 states, as well as the District of Columbia and Puerto Rico. Amedisys stock is actively traded on the NASDAQ under the ticker symbol "AMED."

24. Amedisys is named as the Plan's sponsor in the Plan's Form 5500 filed for the Plan year ended December 31, 2007.

25. Amedisys is identified as the Plan's Administrator in the Plan's annual reports filed with the Department of Labor.

26. As such, the Company, through its Board of Directors, can appoint any person, including employees of the Company, to perform the duties of administrator. Specifically, the Company had discretionary authority to appoint the members of the Administrative Committee. The Company, through the Board of Directors, is required to periodically review the performance of any fiduciary or other person to whom duties are delegated or allocated by it under the provisions of the Plan.

27. During the Class Period, while Amedisys and the other Defendants were engaged in improper practices, were making Amedisys stock available as a Plan investment, and were causing the Plan to acquire and hold Amedisys stock, the Company sold its own shares of stock for proceeds of $118 million.

28. **Defendant William F. Borne** is the founder of Amedisys and has been the Company's Chief Executive Officer and Chairman of the Board of Directors since 1982. During

the Class Period Defendant Borne controlled Amedisys through his positions at the Company, his role as founder, and his ownership of Company stock.

29.     Defendant Borne was a fiduciary of the Plan because he exercised authority or control respecting management or disposition of the Plan and the Plan's assets and he had discretionary authority or discretionary responsibility in the administration of the Plan.

30.     Defendant Borne regularly visited the Company's numerous office locations and discussed the Company's business operations and the performance of the Company's common stock with Amedisys employees and Plan participants.  For instance, at Amedisys' annual Leadership Conferences held each year in March, Defendant Borne and the other Defendants made statements and presentations in which they encouraged Company employees and Plan participants to invest retirement funds in Amedisys stock.

31.     As the Company's misconduct regarding Medicare reimbursement practices came to light and Amedisys's stock price began to fall, Defendant Borne continued to encourage Plan participants and other Amedisys employees to continue investing in Company stock.  For instance, Defendant Borne visited the Company's regional offices following announcement of the SEC investigation to assure Plan participants that the Company did not engage in any wrongdoing and was in a strong financial position and that the Company's stock was a sound retirement investment.  Specifically, Defendant Borne encouraged employee investment in Company stock following announcement of the SEC investigation, touting the drop in Amedisys' stock price as a good "opportunity to buy" more Amedisys stock for employees and Plan participants.

32.     During the Class Period, while Defendant Borne and the other Defendants were making Amedisys stock available as a Plan investment and were causing the Plan to acquire and

7

hold Amedisys stock, Defendant Borne sold his own holdings of that same stock for significant personal profit.

33.    During the Class Period, before the market began to learn about the improper practices at Amedisys, Defendant Borne sold the following amounts of Amedisys stock while he and the other Defendants were causing the Plan to offer, acquire and hold that stock:

| Date | Number of Shares Sold | Proceeds to Defendant Borne |
|---|---|---|
| February 27, 2006 | 3,710 | $116,939 |
| November 9, 2007 | 65,000 | $3,675,547 |
| March 3, 2008 | 12,500 | $527,375 |
| May 5, 2008 | 12,500 | $636,500 |
| August 1, 2008 | 32,500 | $2,026,100 |
| August 5, 2008 | 10,000 | $625,200 |
| August 8, 2008 | 10,000 | $645,200 |
| February 17, 2009 | 12,500 | $628,250 |
| April 1, 2009 | 556 | $15,234 |
| July 28, 2009 | 12,500 | $516,000 |
| October 27, 2009 | 12,500 | $510,625 |
| December 28, 2009 | 12,500 | $625,000 |
| February 23, 2010 | 25,000 | $1,509,000 |
| April 1, 2010 | 2,837 | $161,680 |
| **TOTAL** | 224,603 | $12,218,650 |

34.     As a result of these sales alone, Defendant Borne realized at least $12,218,650 in proceeds from selling his own stock at the same time that he and the other Defendants were offering that stock to the Plan and its participants as a retirement investment.

35.     Additionally, Defendant Borne was personally benefiting from breaching his fiduciary duties because the improper practices allowed him to reap additional compensation based upon the Company's purported financial performance.  In 2009 alone, Defendant Borne benefited from a salary of $750,000, stock awards of $2,437,531, Non-Equity Incentive Plan Compensation of $1,072,500 and other compensation of $58,423.00 as a result of the Company's improper practices.

36.     **Defendant Cindy L. Phillips** is the Company's Senior Vice President of Governance, Diversity, and Compliance.  Defendant Phillips joined Amedisys in 1993 as a benefits coordinator in the Human Resources department and was promoted to Vice President of Human Resources in 1996.

37.     Defendant Phillips signed the Plan's Forms 5500 filed with the DOL on December 10, 2008 and on October 14, 2009, and identified herself as the Plan Administrator.

38.     Upon information and belief, Defendants Phillips was a member of the Plan Administrative Committee during the Class Period.

39.     **Defendant Jeffrey Jeter** is the Company's Chief Compliance Officer and Corporate Counsel.  Defendant Jeter is responsible for developing and implementing policies and procedures designed to ensure compliance with federal healthcare program requirements. Defendant Jeter was also responsible for making periodic reports regarding compliance matters directly to the Board of Directors and was authorized to report any noncompliance to the Board at any time.

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 9 of 37

40.     During the Class Period, while Defendant Jeter and the other Defendants were making Amedisys stock available as a Plan investment and were causing the Plan to acquire and hold Amedisys stock, Defendant Jeter sold his own holdings of that same stock for significant personal profit.

41.     During the Class Period, before the market began to learn about the improper practices at Amedisys, Defendant Jeter sold the following amounts of Amedisys stock while he and the other Defendants were causing the Plan to offer, acquire and hold that stock:

| Date | Number of Shares Sold | Proceeds to Defendant Jeter |
| --- | --- | --- |
| August 18, 2006 | 1,030 | $39,853 |
| November 2, 2007 | 1,779 | $74,202 |
| **TOTAL** | 2,809 | $114,055 |

42.     As a result of these sales, Defendant Jeter realized at least $114,055 in proceeds from selling his own stock at the same time that he and the other Defendants were offering that stock to the Plan and its participants as a retirement investment.

43.     Additionally, Defendant Jeter was personally benefiting from breaching his fiduciary duties because the improper practices allowed him to reap additional compensation based upon the Company's purported financial performance.  In 2009, Defendant Jeter benefited from a salary of over $201,000, stock awards of $136,507, Non-Equity Incentive Plan Compensation of $150,150 and other compensation of $6,945 as a result of the Company's improper practices.

44.     **Defendant The Plan Administrative Committee** ("Committee") is charged with responsibility for administering the Plan and investing the Plan's assets.

45.     The Committee was a named or *de facto* fiduciary of the Plan during the Class Period.

46.     The Committee is required to employ a logical and diligent process to select a menu of investment options that will provide Plan participants with the range of choices necessary to assist them in meeting their retirement needs and protection against excessive investment risk.

47.     Upon information and belief, the members of the Committee had knowledge of the business practices and financial condition of the Company by virtue of the positions they held as high-level Company employees.

48.     The Committee is required to discharge its duties solely in the interest of the Plan, with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.

49.     The specific responsibilities of the Committee relating to the investment management of Plan assets include:

> (a) Adhering to the guidelines as defined by ERISA and all other applicable regulations;
>
> (b) Prudently and diligently selecting qualified investment professionals, including the Plan provider, investment consultant, and custodian;
>
> (c) Preparing and maintaining an Investment Policy Statement for the Plan;
>
> (d) Determining the investment objectives and selecting specific investment options to be offered to the Plan's participants geared towards achieving stated investment objectives;
>
> (e) Avoiding prohibited transactions and conflicts of interest;

11

(f) Providing sufficient asset classes with different and distinct risk/return profiles available under the Plan so that each Plan participant has the opportunity to prudently diversify his/her account given his/her investment circumstances;

(g) Developing and enacting proper control procedures, i.e., replacing investment managers due to fundamental change in investment management process or overall performance;

(h) Providing periodic investment education and communications to Plan participants; and

(i) Selecting, monitoring and, if necessary, recommending the replacement of the Plan provider, investment consultant, custodian or other service provider.

50.     **Defendants John Does 1-10** are additional Amedisys officers, directors, employees and members of any committees – including the Plan Administrative Committee – who were fiduciaries of the Plan during the Class Period, and whose identities are presently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

## DEFENDANTS' FIDUCIARY STATUS

51.     *Named Fiduciaries.* ERISA § 402(a)(1), 29 U.S.C. § 1002(21)(A) requires every plan to provide for one or more named fiduciaries. The person named as the "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

52.     *De Facto Fiduciaries.* ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA § 402(a)(1), but also any other persons who in fact perform

fiduciary functions. Thus, a person is a fiduciary to the extent he or she "(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

53. As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) to manage and administer the Plan, and its investments solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

54. Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration. Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

55. ERISA permits the fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries must still in fact act solely in the interest of participants and beneficiaries, not in the interest of the sponsor. Moreover, all fiduciaries of the Plan were obliged, when acting as fiduciaries, to act independently of Amedisys with respect to the Plan, the

13

Plan's investments, or the disclosure of information between and among fiduciaries or from fiduciaries to the Plan's participants.

## THE PLAN

56.    The Plan was originally adopted on July 1, 1993. The Plan document is dated December 31, 2008 and signed by Cindy L. Phillips Senior Vice President of Human Resources, on behalf of the Company, which is designated as the Plan's sponsor and administrator.

57.    The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1102(3)(A) and a defined contribution 401(k) profit sharing plan within the meaning of ERISA § 3(24), 29 U.S.C. § 1002(34). The Plan allows all eligible employees who have reached 21 years of age, effective the first month after hire date, to defer a portion of their compensation, subject to Internal Revenue Service limits.

58.    The Plan is a legal entity that can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is neither plaintiff nor defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. §1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Thus, in this action Plaintiff seeks plan-wide relief.

59.    The Plan was established for the benefit of the Company's employees and is intended to provide participants with the opportunity to save for retirement.

60.    Employees participating in the Plan can elect to reduce their compensation by a specific percentage (not to exceed 90% in 2008) or dollar amount (not to exceed $15,500 in 2008) and have that amount contributed to the Plan on a pre-tax basis as a salary deferral. Effective January 1, 2007, the Company as the Plan's administrator automatically withholds a portion of

each participant's compensation from his or her pay each payroll period and contributes that amount to the Plan as a salary deferral.

61.     Employees' contributions to the Plan are allocated by the Company as the Plan's administrator to an account maintained on the participant's behalf. Participants are 100% vested in their accounts at all times and are entitled to all amounts that are deferred to the accounts.

62.     The Company makes a discretionary matching contribution equal to a uniform percentage of each employee's salary deferrals. Each year, the Company, acting through its Board of Directors, determines the amount of the discretionary percentage.

63.     All matching contributions are made in Company stock. Employer matching contributions are limited to $0.75 of each $1.00 deferred by the employee up to the first 6% of the employee's compensation, not to exceed 4.5% of the employee's total compensation.

64.     Participants in the Plan are able to direct the investment of their entire interests in the Plan. The Company provides the Plan's participants with information on the investment choices available to the participants, the procedures for making investment elections, the frequency with which the participants can change their investment choices and other important information.

65.     The Plan does not require investment in Amedisys common stock. The Plan provides that Company securities may be offered as an investment option as determined by the Committee.

66.     For Plan years beginning after December 31, 2006, Plan participants may elect to direct the Plan to divest their Plan accounts of investments in Company stock and to reinvest an equivalent amount in other investment options, provided that there are at least three such investment options and that each is diversified and offers materially different risk and return

characteristics. The Plan is required to provide reasonable divestment and reinvestment opportunities at least quarterly.

67. During 2007, 2008 and 2009, the Company's discretionary match of contributions made to each eligible employee was $0.75 for every $1.00 of contribution made up to the first 6% of the participant's salary. These contributions were made in the form of Amedisys common stock, valued based upon the fair value of the stock as of the end of each calendar quarter. The Company expensed approximately $19.4 million, $14.1 million and $8.9 million for contributions in 2009, 2008 and 2007, respectively.

68. As of December 31, 2008, the Plan had 15,160 participants and the Plan held 1,438,831 shares of Amedisys securities valued at $59,150,560. The Plan's holdings in Company stock represented 39.96% of the Plan's total investments.

## DIRECT ACTION ON BEHALF OF THE PLAN

69. Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), Plaintiff, as a participant in the Plan, brings this action directly on behalf of the Plan, seeking all relief to which the Plan is entitled for the breaches of fiduciary duty set forth herein. ERISA § 502(a)(2) expressly authorizes any plan participant to bring an action against a fiduciary who has violated ERISA § 409.

## CLASS ACTION ALLEGATIONS

70. Alternatively, Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between January 1, 2006 and the present and whose account in the Plan included an investment in Amedisys common stock or securities. Excluded from the Class are Defendants, the

16

current and former officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

71.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Amedisys's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. According to the Form 5500 filed by the Plan for the year ending December 31, 2008, there were 22,056 Plan participants at the end of 2008.

72.  Members of the Class may be identified from records maintained by the Plan and may be notified of the pendency of this action by mail, using a form of notice customarily used in ERISA class actions.

73.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether each Defendant owed a fiduciary duty to Plaintiff and other Class members;

(b)  whether Defendants breached their fiduciary duties to Plaintiff and other Class members by failing to act prudently and solely in the interests of participants in the Plan and beneficiaries;

(c)  whether Defendants violated ERISA;

(d)  whether statements made by Defendants to participants in the Plan during the Class Period misrepresented and/or omitted material facts about Amedisys's business and practices, financial status, operations and management; and

17

(e) whether the Class members have sustained damages and, if so, the proper measure of those damages.

74. Plaintiff's claims are typical of the claims of the other Class members because Plaintiff and the other Class members each sustained damages arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

75. Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel competent and experienced in class actions, complex cases, and ERISA litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76. Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecuting separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

77. Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecuting separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

**Amedisys Depends Heavily On Medicare Payments**

78.     Amedisys relies heavily on Medicare payments for the vast majority of its revenue.  Medicare accounted for approximately 90% of the Company's revenue from 2006 through 2009.

**Amedisys's Prior Violations Of The False Claims Act And Corporate Integrity Agreements**

79.     Under the False Claims Act ("FCA"), knowingly presenting or causing to be presented to the United States any false or fraudulent claim for payment violates federal law.  For violating the FCA the United States may recover three times the amount of the damage the government sustained and a civil monetary penalty.  In addition, violating of the FCA can subject the perpetrator to exclusion from participation in federal health care programs.

80.     In 2003, the Company entered into a Corporate Integrity Agreement (the "2003 CIA") with the Office of the Inspector General of the Department of Health and Human Services ("OIG") concerning Amedysis violating the FCA from 1994 through 1999.  During that time, the Company had allegedly billed Medicare for services that were not actually rendered and submitted invalid cost report deductions.  The Company's employees had allegedly altered records, falsified physician and patient signatures, and falsified nurses' notes.

81.     The 2003 CIA mandated that the Company create a position for a Corporate Compliance Officer and a compliance committee.  Amedisys appointed Defendant Jeter as Corporate Compliance Officer.  The Corporate Compliance Officer would be responsible for developing and implementing policies and procedures designed to ensure compliance with federal healthcare program requirements. The 2003 CIA also required that the Company maintain written

19

standards of conduct. Also in connection with these violations, Amedisys agreed to pay the United States Department of Justice a penalty of $1.156 million.

82. On October 1, 2008, the Company acquired Home Health Corporation of America ("HHCA"), another company with previous violations. In 2005, HHCA had entered into a Corporate Integrity Agreement ("2005 CIA") following its alleged involvement in an illegal kickback scheme in 1997 and 1998.

83. In connection with Amedisys's acquisition of HHCA, the provisions of the 2005 CIA were binding on Amedisys. The 2005 CIA required that Defendant Jeter, as the Company's Compliance Officer, make periodic reports regarding compliance matters directly to the Board of Directors, and authorized the Compliance Officer to report any noncompliance to the Board at any time. The 2005 CIA also included a stipulation to penalties for non-compliance, which included possible exclusion from participation in Medicare programs.

84. Such exclusion would result in catastrophic damages to the Company and the Plan participants because the Company would lose its Medicare patients, which are the source of almost 90% of its revenues.

**Amedisys Stock Was An Imprudent Investment**

85. Throughout the Class Period the Company directed its employees to schedule extra home therapy appointments solely to trigger the extra Medicare payments even when such visits were not medically necessary. By increasing the number of home therapy visits, Amedisys inflated its home health Medicare revenue.

86. Specifically, during the Class Period the Company regularly held weekly meetings called "care conferences" where Defendants emphasized that Medicare is a major part of Amedisys's business proceeds and encouraged Amedisys employees to maximize patient visits

and sales of the Company's other services for purposes of increasing Medicare reimbursements to the Company. As incentive to provide and bill for unnecessary Medicare services, Defendants offered special bonus payments to employees who exceeded the sales goals that Defendants set for them.

87.     Before 2008, Amedisys provided many of its patients just enough home therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. For example, in 2007, 28.5% of Amedisys's patients who received home therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. In January 2008, when CMS changed its reimbursement rules, Amedisys also modified its home therapy procedures in order to trigger the extra Medicare payments at six, fourteen and twenty visits. Indeed, in 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that received six, fourteen and twenty visits increased by 8%, 33% and 41%, respectively.

88.     The actions taken by the Company to increase the number of visits to meet Medicare benchmarks were expressly or implicitly approved by management and Amedisys's Board of Directors.

89.     The improper Medicare reimbursement practices at the Company were widespread, prevalent, and continued throughout the Class Period.

90.     In addition to the damage already caused, the liability the Company faces is substantial. For instance, violations of the False Claims Act ("FCA") can lead to the exclusion of the Company from Medicare and Medicaid programs. Because 90% of the Company's revenues come from Medicare, such exclusion could ruin Amedisys and further deplete the value of the Plan's retirement investments in Company stock.

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 21 of 37

91. Because of their advisory, executive, managerial and directorial positions with Amedisys, each of the Defendants had access to adverse, non-public information about the financial condition, business operation, and management of the Company.

92. Throughout the Class Period Defendants continued to offer Amedisys stock as a retirement investment even though the Company lacked adequate internal controls and engaged in improper Medicare reimbursement practices that inflated its reported sales and earnings by intentionally increasing the number of in-home therapy visits to Amedisys patients that were not always medically necessary.

**The April 27, 2010 *Wall Street Journal* Article**

93. On April 27, 2010, *The Wall Street Journal* ("*WSJ*") reported that Amedisys had been taking advantage of the Medicare reimbursement system by increasing the number of home therapy visits in order to trigger additional reimbursements. The article disclosed the following in relevant part:

> ... Among health-care stocks, Amedisys has been a star, soaring to $60 a share yesterday [April 25, 2010] from less than $1 in 2000.
>
> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-cart policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.
>
> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 22 of 37

"I was told 'we have to have ten visits to get paid,'" says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

*     *     *

"The tenth visit was not always medically necessary," Ms. Trusler says. The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according to The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare payment. Such cases are highly profitable because they cost the company less than $80 per visit.

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement targets is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedPAC suggested for the first time last month that the Secretary of Health and Human Services "review home health agencies that exhibit unusual patterns of claims for payment."

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and the percentage getting 20 visits increased 41%.

*     *     *

In 2000, Medicare rolled out its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many times a nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed.

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home healthcare industry has grown so swiftly, according to MedPAC. There are now more than 10,400 home-health agencies in the U.S., up nearly 50% since 2002.

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

94.     In response to the article, Amedisys common stock fell $3.98 or 6.5% at the close of trading that same day.

## The Investigations By The Senate Finance Committee And SEC

95.     Following the *WSJ* article, the Senate Finance Committee started an investigation into Amedisys's billing and operating practices. In a letter to Amedisys dated May 12, 2010, the

24

Finance Committee cited the article and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements." The letter stated that the findings reported in the article suggests that Amedisys is "basing the number of therapy visits [it] provide[s] on how much Medicare will pay [it] instead of what is in the best interests of patients." Moreover, the Finance Committee's letter noted that when Medicare changed its payment rules in 2008 to provide additional reimbursement to patients when they had six, fourteen and twenty therapy visits, Amedisys "apparently changed [its] utilization patterns as a result of these payment policy changes." In addition, the Finance Committee noted that the physician referral form associated with Amedisys's Balanced for Life program "raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits."

96.     The Finance Committee also questioned marketing materials that aim to target seniors "to take advantage of Medicare payments to improve profits." Accordingly, the Finance Committee requested that Amedisys produce various documents to it.

97.     On May 13, 2010, the *WSJ* reported that the Finance Committee had launched an investigation into the practices of Amedisys and whether the Company has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements."

98.     In the wake of this report, Amedisys common stock fell nearly 8% or $4.48 to close at $51.73 per share that same day.

99.     On June 30, 2010, Amedisys announced that it had received notice of a formal investigation from the SEC and received a subpoena for documents relating to matters under review by the Finance Committee.

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 25 of 37

100.    In response, on July 1, 2010 the price of Amedisys stock declined from a close on June 30, 2010 of $43.98 per share to close at $39.34 per share, a decline of $4.64 per share or approximately 11%, on higher than usual volume.

101.    Amedisys stock was also instantly downgraded to "neutral" or "hold" ratings from earlier "buy" ratings by analysts including the Branch Banking and Trust Company, Jefferies & Company, SunTrust Robinson, and Robert W. Baird & Company.

102.    On July 2, 2010, the *WSJ* reported that the SEC was investigating whether Amedisys "pushed patients into extra, sometimes unnecessary, home-health care visits in order to hit a threshold level that secured them thousands more in reimbursements from the government's health-care program."

103.    In response, the price of Amedisys stock dropped further to close that day at $37.80.

104.    On July 13, 2010, Amedisys announced that its second quarter earnings would drop substantially, in part, due to nonrecurring costs of 17 cents per share connected with the investigations. As a result, the price of Amedisys stock fell another 24% that day to close at $26.57.

105.    On July 15, 2010, Amedisys issued a 20-page "Open Letter to Shareholders" addressing the allegations raised by the *WSJ* reports and the investigations by the Finance Committee and the SEC. In the letter, signed by Defendant Borne, the Company reported that it was cooperating with the investigations but "believe[s] that the WSJ article is based upon an inaccurate understanding of a very complex industry… and that it overlooked some very important facts." The Company stated that it was "disappointed that [the *WSJ* reporter] presented

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 26 of 37

what we believe is an unbalanced story" and the Company cited data and other information that it had produced to the Finance Committee and SEC to support its position.

106.    Defendant Borne issued numerous statements to Amedisys employees and Plan participants undermining the accuracy of the *WSJ* story and assuring them that the Company would be found to have complied with all Medicare reimbursement requirements.

107.    However, as the market learned about the improper practices, the Company's stock price plummeted taking with it the retirement savings in the Plan that were invested in Amedisys stock.

108.    Over the course of the Class Period, the market price of Amedisys stock has dropped 60%, or $39, from a high of $64 per share in August 2008, and currently trades at approximately $27 per share.

109.    Defendants are liable under ERISA to restore the lost profits and the losses of vested benefits sustained by the Plan as a result of Defendants' breaching their fiduciary obligations.

110.    Plaintiff seeks alternative types of relief under ERISA.

111.    Plaintiff and the Plan seek their lost profits as a result of Defendants' breaches. In particular, Plaintiff and the Plan seek the profit they lost by investing in Amedisys stock instead of investing in other funds within the Plan that were available at the time and that outperformed the returns on Amedisys stock.

112.    Plaintiff and the Plan seek to recover the losses that they incurred by investing their retirement funds in Amedisys stock when the stock price was artificially inflated.

113.     Plaintiff and the Plan seek to recover the losses caused to the Plan and its Participants when the price of Amedisys stock declined significantly as the market began to learn about the Company's improper practices.

114.     In addition, Plaintiff seeks equitable relief under ERISA.

## CAUSES OF ACTION

A.     **Count One: Failure to Prudently and Loyally Manage the Plan's Assets (Breaches of Fiduciary Duties in Violation of ERISA § 404 and § 405 by All Defendants)**

115.     Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

116.     At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

117.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in Amedisys stock in the Plan were prudent and that such investments were consistent with the purpose of the Plan. Defendants are liable for losses incurred as a result of such investments being imprudent.

118.     A fiduciary's duty of loyalty and prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries. ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that would

Case 3:10-cv-00642-BAJ-SCR    Document 1    09/27/10    Page 28 of 37

lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plan, including plan trustees, to do so.

119. Defendants' duty of loyalty and prudence also obligates them to speak truthfully to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investment options such that participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all of the Plan's investment options, including investment in Amedisys stock.

120. Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that, as described herein, Amedisys stock was not a suitable and appropriate Plan investment option. Investment in Amedisys stock during the Class Period clearly did not serve the Plan's stated purpose of helping participants save for retirement, and in fact caused significant losses and depreciation to participants' retirement savings. During the Class Period, despite their knowledge of the imprudence of the investment due to, *inter alia*, gross mismanagement of the Company as well as non-disclosed material problems, Defendants failed to take any meaningful steps to protect Plan Participants from the inevitable losses that they knew would ensue as the non-disclosed material problems, concerns and business slowdowns took hold and became public.

121. Defendants' duty of loyalty and prudence also obligates them to speak truthfully

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 29 of 37

to participants, not to mislead them regarding the Plan or Plan assets, and to disclose information that participants need in order to exercise their rights and interests under the Plan. This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the fees paid out by the Plan or the prudence of maintaining investment in the Plan, so that participants can make informed decisions with regard to their investment options available under the Plan.

122. Defendants breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition, the Company's improper Medicare reimbursement practices and the consequent artificial inflation of the value of the Company stock and, generally, by conveying inaccurate information regarding the Company's practices and future outlook. Defendants conveyed inaccurate information regarding the soundness of the Company's financial health and the prudence of investing retirement contributions in Amedisys stock.

123. Further, during the Class Period the Defendants fostered a positive attitude toward the Company's stock, allowed Plan participants to follow their natural bias towards investing in the equities of their employer by not disclosing negative material information concerning investing in the Company's stock. Indeed, Defendants affirmatively encouraged Amedisys employees and Plan participants to invest in Company stock even when they knew such investment was imprudent. Plan participants could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plans.

124. Had the Defendants not constantly reinforced the safety, stability and prudence of

Case 3:10-cv-00642-BAJ-SCR   Document 1    09/27/10   Page 30 of 37

investing in Amedisys stock during the Class Period, Plan Participants, to the extent they were permitted, could have divested their holdings of Amedisys stock in the Plan or at least diversified such holdings, thereby mitigating the Plan's losses.

125.    Defendants also breached their co-fiduciary obligations by participating in, or undertaking to conceal, the other Defendants' failure to disclose crucial information regarding the Company's operations and artificial inflation of the price of the Company stock.  Defendants had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy the same.

126.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, Plaintiff and the other participants and beneficiaries of the Plan, lost a significant portion off their retirement investment.

127.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**B.    Count Two: Breach of Duty to Avoid Conflicts of Interest (Breaches of Fiduciary Duties in Violation of ERISA §§ 404 and 405 by all Defendants)**

128.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

129.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Consequently, they were bound by the duties of loyalty, exclusive purpose and prudence.

130.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), imposes on plan fiduciaries a duty of loyalty, that is, a duty to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to

31

participants and beneficiaries.

131.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them by failing to timely engage independent fiduciaries who could make independent judgments concerning the Plan's investments in the Company's own securities, and by otherwise placing their own interests or the Company's interests above the interests of the participants with respect to the Plan's investments in the Company's securities.

132.    As a consequence of Defendants' breaches of fiduciary duty, the Plan suffered tens of millions of dollars in losses.  If Defendants had discharged their fiduciary duties to prudently manage and invest the Plan's assets, the losses suffered by the Plan would have been minimized or avoided.  Therefore, as a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other participants and beneficiaries of the Plan, lost a significant portion of their retirement investments.

133.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), and ERISA § 409, 29 U.S.C. 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**C.      Count Three: Failure to Adequately Monitor Other Fiduciaries (Breaches of Fiduciary Duties in Violation of ERISA § 404 by Defendants)**

134.    Plaintiff incorporates the allegations contained in the paragraphs above as if they were fully set forth in this Count.

135.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

136.    At all relevant times, Defendants' fiduciary responsibilities included the responsibility to appoint, evaluate and monitor other fiduciaries.

137. The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that means that Defendants had the duty to:

(a) Ensure that the monitored fiduciaries possessed the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties. They must have been knowledgeable about the behavior of the Plan and the behavior of the Plan's participants;

(b) Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(c) Ensure that the monitored fiduciaries had adequate information to do their job of overseeing the Plan's investments;

(d) Ensure that the monitored fiduciaries had ready access to outside, impartial advisors when needed;

(e) Ensure that monitored fiduciaries maintained adequate records of the information on which they were basing their decisions and analysis with respect to the Plan's investment options; and

(f) Ensure that the monitored fiduciaries reported regularly to the other Defendants. Defendants must have then reviewed, understood and approved the conduct of these "hands-on" fiduciaries.

138. Under ERISA, a monitoring fiduciary must also ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of a plan's asset, and must take prompt and effective action to protect a Plan Participants when they are not. In addition, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or

Case 3:10-cv-00642-BAJ-SCR   Document 1   09/27/10   Page 33 of 37

reasonably should know that the monitored fiduciaries must have in order to prudently manage a plan and a plan's assets.

139.    Defendants breached their fiduciary monitoring duties by: (a) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's improper business practices alleged above, which made Amedisys stock an imprudent retirement investment; and (b) failing to ensure that the monitored fiduciaries completely appreciated the huge risk of significant investment of the retirement savings of rank and file employees in Amedisys stock, an investment that was imprudent and subject to inevitable and significant depreciation.

140.    Defendants knew or should have known that the fiduciaries they were responsible for monitoring were allowing the Plan to continue offering Amedisys as an investment alternative when it no longer was prudent to do so.

141.    Despite this knowledge, Defendants failed to take action to protect the Plan, and concomitantly the Plan Participants, from the consequences of these fiduciaries' failures.

142.    In addition, Defendants, in connection with the monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition of Amedisys that they knew or should have known that these Defendants needed to make sufficiently informed decisions.   By remaining silent and failing to disclose such information from the other fiduciaries, these Defendants breached their monitoring duties under the Plan and ERISA.

143.    Defendants are liable as co-fiduciaries because they knowingly participated in each other's fiduciary breaches as well as those by the monitored fiduciaries, they enabled the breaches by these Defendants, and they failed to make any effort to remedy these breaches, despite having knowledge of them.

34

144.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the other participants and beneficiaries of the Plan, lost a significant portion of their retirement investments.

145.     Pursuant to ERISA § 502(a), 29 U.S.C. §1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## CAUSATION

146.     Because of Defendants' breaches, the Plan and Plan Participants used retirement assets to acquire Amedisys stock at prices that were artificially inflated and overly risky.

147.     Because of Defendants' breaches, the Plans and Plan Participants used retirement assets to invest in Amedisys stock instead of other alternative investments in the Plan, including alternative Plan investments which out-performed the returns on Amedisys.

148.     When the market began to learn the truth about the misconduct at Amedisys and the investigations into the Company's Medicare reimbursement practices, the Company's stock price declined, taking with it the vested retirement benefits of the Plan.

149.     The Plan suffered tens of millions of dollars in losses because substantial assets of the Plan were imprudently invested, or allowed to be invested by Defendants, in Amedisys stock during the Class Period, in breach of Defendants' fiduciary duties. These losses were reflected in the diminished account balances of the Plan's participants.

150.     Had Defendants properly discharged their fiduciary and co-fiduciary duties, the Plan Participants would have avoided a substantial portion of the losses that they suffered through their continued investment in Amedisys stock.

**WHEREFORE**, Plaintiff prays for an Order:

A.    declaring that Defendants, and each of them, have breached their ERISA fiduciary duties to the Plan and its Participants;

B.    compelling Defendants to make good to the Plan all losses to the Plan resulting from their breaches of fiduciary duties, including losses to the Plan resulting from imprudent investments of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.    imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched as the result of breaches of fiduciary duty;

D.    enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

E.    determining actual damages in the amount of any losses the Plan suffered, to be allocated amount the participants' individual accounts in proportion to the accounts' losses;

F.    allocating the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in Amedisys stock or units maintained by the Plan in proportion to the account's diminution of vested benefits attributable to the decline in the price of Company stock and units in the Plan;

G.    awarding costs pursuant to 29 U.S.C. § 1132(g);

H.    awarding attorneys' fees and expenses pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

I.    awarding equitable restitution and other appropriate equitable monetary relief against Defendants.

36

Dated: 9/27/10

By: _____
Phil Bohrer (LSBA#14089)
Scott E. Brady (LSBA#24976)
**BOHRER LAW FIRM, L.L.C.**
8712 Jefferson Highway, Suite B
Baton Rouge, LA 70809
Telephone: (225) 925-5297
Facsimile: (225) 231-7000
Email: phil@bohrerlaw.com
Email: scott@bohrerlaw.com

Stephen J. Fearon, Jr.
Olga Anna Posmyk
Caitlin Duffy
**SQUITIERI & FEARON LLP**
32 E. 57th Street, 12th Floor
New York, NY 10022
Telephone: (212) 421-6492
Facsimile: (212) 421-6553
Email: stephen@sfclasslaw.com
Email: olga@sfclasslaw.com
Email: caitlin@sfclasslaw.com

*Counsel for Plaintiff*